**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DE LAGE LANDEN FINANCIAL SERVICES, INC.,** | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **CIVIL ACTION** |
| | : | |
| **SOUTHERN ILLINOIS INTERNAL MEDICINE, LTD; AND MAZHAR H. LAKHO,** | : | |
| | : | **NO. 25-1619** |
| | : | |
| | : | |
| Defendants, | : | |
| | : | |
| v. | : | |
| | : | |
| **INVASIX, INC.,** | : | |
| | : | |
| Third-Party Defendant. | : | |

**Perez, J.**                                                                                          **May 29, 2026**

**MEMORANDUM**

This dispute arises from the sale of a cosmetic medical device sold by Invasix, Inc. ("Invasix") to Southern Illinois Internal Medicine, Ltd. ("SIIM"). The sale was financed by De Lage Landen Financial Services, Inc. ("DLL") and involved several contracts entered into between the parties. Shortly after executing the contract, SIIM had a change of heart and sought to reject and/or return the device and made no payments it owed to DLL under the finance lease. DLL sued SIIM for breach of contract and SIIM's sole owner Dr. Mazhar H. Lakho for breach of personal guaranty. SIIM and Dr. Lakho contend, however, that the contracts were the result of fraud on the part of Invasix employee Clay Ditslear, so they brought third-party fraud-based claims against Invasix.

1

Before the Court are the parties' cross-motions for summary judgment. DLL affirmatively moves for summary judgment on its breach of contract and breach of personal guaranty claims, and Dr. Lakho moves for summary judgment on DLL's breach of personal guaranty and unjust enrichment claims. However, neither party has shown they are entitled to judgment as a matter of law, and material factual disputes remain. Their motions must be denied. Invasix moves for summary judgment on Defendants' fraud-based claims. The alleged misrepresentations or omissions upon which Defendants relied could have easily been discovered had Dr. Lakho read the writings he signed. "[A] party may not enter into a transaction with its eyes closed to available information and then charge that it has been deceived by another." *Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc.*, 250 F.3d 570, 574 (7th Cir. 2001) (cleaned up). For that reason and the reasons discussed more fully below, Invasix's motion is granted.

## I.       Factual Background[1]

Plaintiff DLL is a finance company that provides vendor financing for products and services offered by a vendor when the vendor's customer requires financing. DLL Statement of Facts, ECF No. 36 ¶ 1. Third-Party Defendant Invasix is a corporation that sells aesthetic technology, such as skin tightening treatments, laser hair removal, and resurfacing equipment, including a device known as Morpheus8. Invasix Statement of Facts, ECF No. 40 ¶¶ 22, 23. Defendant Dr. Mazhar H. Lakho is the sole shareholder and President of the internal medicine practice SIIM. *Id.* ¶¶ 2, 11.

Invasix employed Clayton Ditslear as a Territory Manager. *Id.* ¶ 27. Ditslear went to SIIM's office several times to meet with Dr. Lakho to sell SIIM the Morpheus8. *Id.* ¶ 29. Ditslear collected

---

[1] The facts in this section are undisputed unless otherwise noted. The facts are taken from the Statements of Undisputed Facts submitted by DLL, Dr. Lakho, and Invasix, as well as the corresponding exhibits. *See* ECF Nos. 36 (DLL's SOF), 37 (Lakho SOF), and 40 (Invasix SOF), 41 (Exhibits).

Dr. Lakho's and SIIM's information and submitted a credit application to Financial Partners Group ("FFP") to determine credit worthiness and to identify potential lenders to facilitate SIIM's purchase of the Morpheus8. *Id.* ¶ 33. As part of the credit application, Dr. Lakho provided Ditslear with his Social Security number ("SSN"). *Id.* ¶ 34. FFP identified DLL as a lender. *Id.* 40 ¶ 50.

On December 18, 2023, Ditslear met with Dr. Lakho at SIIM's office to close on the transaction for the Morpheus8. *Id.* ¶ 38. That day, Dr. Lakho executed the Customer Purchase Agreement ("CPA"), which is the agreement of sale between SIIM and Invasix. *Id.* ¶ 39; *see also* CPA, Ex. G, ECF No. 41-7. Dr. Lakho contends he executed the agreement based upon Ditslear's representation that SIIM would be able to return the Morpheus8. *Id.* The CPA contains no return clause. ECF No. 41-7.

The CPA lists the price of the Morpheus8 as $121,000. *Id.* The CPA contains the following relevant language:

> ACCEPTANCE OF AGREEMENT By signing below, Customer is representing to Invasix, Inc. ("Company"), which operates through the trade name InMode, that it 1) has read understands, and accepts the terms of this Customer Purchase Agreement, the Terms and Conditions Addendum, which is available at www.Inmodemd.com/terms-US/ and incorporated herein by reference . . . .

> Customer further acknowledges that this is the complete Agreement between the parties, is subject to the payment terms and conditions contained or referred to herein, and expressly disclaims any additional and/or different terms and conditions stated on any purchase orders, sales quotes or other written or oral proposals shared or discussed between the parties.

*Id.* Dr. Lakho did not review the Terms and Conditions Addendum ("T&C") on InMode's website before signing the Customer Purchase Agreement. ECF No. 40 ¶ 47. When asked about the clause referring to the T&C, Dr. Lakho testified that he did not pay attention to it and that he signed because he "trusted" Ditslear. ECF No. 41-1 at 24. Invasix and DLL agree that the T&C on InMode's website states in bold that "All sales and purchases under the [CPA] are final and non-

refundable. Company grants no right of return to Customer for any purchased System or other items." *Id.* ¶ 46; SIIM Dep. Tr. at 87–88, Ex. A, ECF No. 41-1 at 24. SIIM and Dr. Lakho contend they do not have the T&C, so they are unable to confirm the accuracy of that statement. ECF No. 40 ¶ 46 and SIIM/Lakho's Response. The T&C was not attached as an exhibit.

In addition to the CPA, Dr. Lakho signed a Lease Contract ("Lease"), which had handwritten sections pre-populated by Ditslear, including Dr. Lakho's SSN. *Id.* ¶ 52; *see also* Lease, Ex. H, ECF No. 41-8; Ditslear Dep. Tr. at 87, Ex. E, ECF No. 41-5 at 24. Dr. Lakho testified that he could not recall whether the SSN was written on the lease before he signed. *See* ECF No. 40 ¶ 52 and responses; Lakho Dep. Tr. at 103, Ex. A, ECF No. 41-1 at 28.

The Lease lists SIIM as the Lessee, Dr. Lakho as the Owner/Principal of SIIM, and DLL as the Lessor. ECF No. 41-8. The Lease includes specific payment terms and a personal guaranty provision. ECF No. 40 ¶¶ 54, 55; ECF No. 41-8. The personal guaranty specifically states:

> I, the guarantor identified by the Social Security Number above, unconditionally guaranty prompt payment of all the Lessee's obligations. Lessor is not required to proceed against Lessee or Equipment or enforce other remedies before proceeding against me. I waive notice of acceptance and all other notices or demands of any kind to which I may be entitled. I consent to any extensions or modification granted to Lessee and the release and/or compromise of any obligations of Lessee or any other guarantors without releasing me from my obligations. This is a continuing guaranty and will remain in effect in the event of my death and may be enforced by or for the benefit of any assignee or successor of Lessor. This guaranty is governed by and construed in accordance with the Laws of the Commonwealth of Pennsylvania and I consent to non-exclusive jurisdiction in any state or federal court in Pennsylvania and waive trial by jury. I ACKNOWLEDGE AND AGREE THAT IF I ENTER MY SOCIAL SECURITY NUMBER ABOVE, THEN MY SIGNATURE, IN ADDITION TO BINDING THE LESSEE THROUGH MY CORPORATE CAPACITY, SHALL ALSO BIND ME PERSONALLY AS A GUARANTOR, CONFIRMING MY ACCEPTANCE OF THE OBLIGATIONS CONTAINED IN THIS SECTION AND CONSENTING TO LESSOR OBTAINING MY CONSUMER CREDIT REPORT IN CONNECTION WITH THIS LEASE.

4

ECF No. 41-8.

A Purchase Order dated December 19, 2023, states that the Morpheus8 was sold for $121,000 by vendor InMode to DLL and was shipped to SIIM, the Lessee. Purchase Order, Ex. S, ECF No. 41-19.

At some point after executing the CPA and Lease, SIIM determined it did not want the Morpheus8. ECF No. 40 ¶ 80. On an unknown date between December 18, 2023, and January 2, 2024, the Morpheus8 was delivered to SIIM. ECF No. 40 ¶ 76. Dr. Lakho was out of the office that day. *Id.* SIIM contends it immediately rejected the equipment. *Id.* ¶ 76 and SIIM/Lakho's Response. Invasix contends the equipment was signed for by a SIIM employee, but there is no evidence in the record establishing that assertion. *See id.* ¶ 78 (citing ECF No. 41-1 at 32 (Lakho testifying that he did not know who was in the office on the day the Morpheus8 was delivered, but he thinks the manager Tammy was present and "[s]he may have been" the person who signed for it)). Defendants contend the issue of rejection remains in dispute. *Id.* ¶ 78 and SIIM/Lakho's Response.

On the morning of January 2, 2024, Ditslear went to SIIM's office to unbox the Morpheus8 and make sure everything was "firing properly." *Id.* ¶ 77. Dr. Lakho was not present at that time. *Id.* ¶ 77 and SIIM/Lakho's Response. It is not clear exactly what time Ditslear arrived, other than that he testified it was "first thing in the morning." *See* ECF No. 41-5 at 28. At 9:59 a.m. on January 2, 2024, Dr. Lakho texted Ditslear asking him not to unbox the Morpheus8 and stating, "[w]e may not be able to buy the machine in anyway." Ex. K, ECF No. 41-11 at 6. Ditslear did not see the text message until after he unboxed the machine. ECF No. 41-5 at 28. At 11:36 a.m., Ditslear responded saying, "the Morpheus is unboxed in your office." *Id.* Ditslear testified that if he had seen Dr. Lakho's text message before unboxing the Morpheus8, he would not have unboxed it. ECF No. 41-5 at 28. SIIM requested to return the Morpheus8 device to Invasix after it was

delivered. ECF No. 37 ¶ 13. Neither DLL nor Invasix has picked up the device. *Id.* ¶ 14. Ditslear eventually stopped responding to Dr. Lakho's requests to return it. *See* ECF No. 41-5 at 32. Dr. Lakho and SIIM contend the Morpheus8 remains in the packaging and has never been plugged in, turned on, or used. ECF No. 40 ¶¶ 90–93. SIIM has never made any payment to DLL pursuant to the Lease. *Id.* ¶ 83.

## II.      Procedural History

On February 20, 2025, DLL sued Defendants SIIM and Dr. Lakho in the Court of Common Pleas of Chester County Pennsylvania, for breach of the Lease, breach of personal guaranty, and unjust enrichment. ECF No. 1-1. On March 27, 2024, Defendants removed the case to this Court, asserting diversity jurisdiction. ECF No. 1. On April 3, 2025, Defendants answered the Complaint, asserting a number of affirmative defenses. ECF No. 9.

On June 24, 2025, Defendants filed a Third-Party Complaint against InMode, Ltd. ("InMode") and Invasix Inc. ("Invasix" or "Third-Party Defendant"), raising three claims: Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Consumer Fraud Act" or "ICFA"), fraudulent inducement, and fraudulent misrepresentation. ECF No. 13. On July 30, 2025, Defendants voluntarily dismissed their claims against InMode without prejudice. ECF No. 17. Invasix answered the Third-Party Complaint on August 8, 2025, raising eighteen affirmative defenses. ECF No. 19.

On October 27, 2025, DLL and Invasix filed motions for a non-jury trial. ECF Nos. 25 & 26. Defendants opposed only with respect to their claims against Invasix. ECF No. On November 20, 2025, the Court granted in part the motions, holding DLL's claims against Defendants must be heard in a bench trial, and Defendants' claims against Invasix must be heard by a jury. ECF No. 30.

On April 7, 2026, each party moved for summary judgment. ECF Nos. 35 (De Lage MSJ), 38 (Lakho MSJ), 39 (Invasix MSJ). Oppositions and replies have been filed, and the motions are ripe for review.

### III. Summary Judgment Standard

Summary judgment is properly granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are material if they "might affect the outcome of the suit under the governing law." *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020). A dispute as to those facts "is genuine if the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A party asserting a fact is genuinely disputed must support its contention by citing to particular materials in the record. Fed. R. Civ. P. 56(c).

A party pursuing claims of fraud must prove them by clear and convincing evidence, and at summary judgment, the Court must evaluate the evidence "through the prism of the substantive evidentiary burden." *Richelieu Foods, Inc. v. New Horizon Warehouse Distrib. Ctr.*, 67 F. Supp. 3d 903, 915 (N.D. Ill. 2014) (quoting *Anderson*, 477 U.S. at 254; and citing *JP Morgan Chase Bank, N.A. v. Asia Pulp & Paper Co.*, 707 F.3d 853, 864 (7th Cir. 2013)).

### IV. DLL Is Not Entitled to Summary Judgment on its Breach of Contract Claim Against SIIM.

#### A. The Lease is a Finance Lease Governed by 13 Pa. C.S.A. § 2A103 (Article 2A of the UCC).

As an initial matter, the parties dispute whether the Lease is a finance lease under Article 2A of the UCC or a loan. *See* ECF No. 45 at 9–10. If it is a finance lease, the parties agree that SIIM's obligation to pay became irrevocable and independent upon acceptance of the Morpheus8.

13 Pa. C.S.A. § 2A407; *see also* ECF No. 45 at 10. The Court finds that the Lease is a finance lease under Article 2A.

"A finance lease is the product of a three party transaction," in which a "supplier manufactures or supplies the goods pursuant to the lessee's specification," and the lessor and lessee "enter into a lease or sublease of the goods." 13 Pa. C.S.A. § 2A103, cmt (g). "Due to the limited function usually performed by the lessor, the lessee looks almost entirely to the supplier for representations, covenants and warranties." *Id.* "Even 'if a transaction does not qualify as a finance lease, the parties may achieve the same result by agreement.'" *De Lage Landen Fin. Servs., Inc. v. Rasa Floors, LP*, 792 F. Supp. 2d 812, 828 (E.D. Pa. 2011) (brackets omitted) (quoting 13 Pa. C.S.A. § 2A103, cmt. (g)); *see also De Lage Landen Fin. Servs., Inc. v. M.B. Mgmt. Co., Inc.*, 888 A.2d 895, 900–01 (Pa. Super. Ct. 2005) (finding the parties bound by the language contained in the contract explicitly agreeing that the lease was a finance lease as defined in article 2A). When parties form a finance lease under Article 2A, the lessee's obligations "become irrevocable and independent upon the lessee's acceptance of the goods." 13 Pa. C.S.A. § 2A407. This is known as a "hell or high water" clause. *Id.*, cmt. 1; *see also Rasa Floors*, 792 F. Supp. 2d at 828.

Here, Section 10 of the Lease states that it is a "Finance Lease" under Article 2A and that SIIM "irrevocably waive[s] any and all rights and remedies . . . under UCC sections 2A-508 through 2A-522." ECF No. 41-8. Section 1 mirrors Article 2A's "hell or high water" clause, stating: "You agree that this [sic] your obligations under this Lease are absolute, unconditional, and not subject to cancellation, reduction, setoff or counterclaim." *Id.* Section 4 directs the lessee to make any claims relating to maintenance, service, and supplies against the service provider, not DLL, and requires the lessee to continue paying DLL, whether or not requested services are provided.

*Id.* Taken together, the Lease's terms clearly establish it is a finance lease, regardless of whether it meets the statutory requirements. *See M.B. Mgmt.*, 888 A.2d at 900–01.

Defendants attempt to muddy the waters by pointing to the testimony of DLL's Rule 30(b)(6) designee Andrew Chesbro, wherein he characterized the transaction as a loan. *See* ECF No. 45 at 9 (quoting Chesbro Dep., ECF No. 41-6 at 15). This testimony does not change the terms of the Lease. A lay witness's testimony as to his understanding of the parties' agreement does not create a dispute of material fact where the contract's terms are unambiguous. "Contract interpretation is a question of law that requires the court to ascertain and give effect to the intent of the contracting parties as embodied in the written agreement. . . . When a writing is clear and unequivocal, its meaning must be determined by its contents alone." *In re Old Summit Mfg., LLC*, 523 F.3d 134, 137 (3d Cir. 2008) (quoting *Dep't of Transp. v. Pa. Indus. for the Blind & Handicapped*, 886 A.2d 706, 711 (Pa. Commw. Ct. 2005)). Here, the Lease is clear and unequivocal that it is a finance lease governed by Article 2A of the UCC. The Court must determine its meaning by the contents of the Lease alone. Chesbro's characterization of the transaction does not overcome the written terms of the Lease.

### B.      There is a Genuine Dispute as to Whether SIIM Accepted or Rejected the Morpheus8.

Even though the Lease is a finance lease with a "hell or high water" clause, that provision cannot take effect if the Morpheus8 was never accepted. DLL argues the delivery of the Morpheus8, for which a SIIM staff member signed, constituted acceptance. ECF No. 35-1 at 12. Defendants contend the Morpheus8 was not accepted, and that Dr. Lakho attempted to reject the device by texting Ditslear not to unbox it and later seeking to return it. *See* ECF No. 45 at 14.[2] The

---

[2] Section 3 of the Lease provides: "You acknowledge that by signing below you have tested and accepted the Equipment and that it is in good working order." ECF No. 41-8. Defendants contend there is no "signature below," so the signing of the Lease itself cannot constitute acceptance. ECF No. 45 at 14. The Court does not resolve this issue

Court cannot resolve this factual dispute on the current record, so summary judgment is not appropriate.

Under Article 2 of the UCC, "[a]cceptance of goods occurs when the buyer . . . fails to make an effective rejection" after having "a reasonable opportunity to inspect them." 13 Pa. C.S.A. § 2606(a). A rejection of goods "must be within a reasonable time after their delivery." 13 Pa. C.S.A. § 2602(a). There is no requirement that rejection occur before or at the time of delivery. *Id.* Even a wrongful rejection may still be effective if it is timely. *Integrated Circuits Unltd. v. E.F. Johnson Co.*, 875 F.2d 1040, 1042 (2d Cir. 1989) (quoting 1 White & Summers, *Uniform Commercial Code* 314 (2d ed. 1980)).[3]

DLL relies on the Lease's "hell or high water" clause, which states the Lessee's obligations are "absolute, unconditional, and are not subject to cancellation, reduction, setoff or counterclaim." DLL SOF ¶ 18, ECF No. 36; *see also* ECF No. 45 at 5. However, that puts the cart before the horse. The clause only takes effect upon acceptance of the goods. *See* 13 Pa. C.S.A. § 2A407 ("In the case of a finance lease . . . , the lessee's promises under the lease contract become irrevocable and independent *upon the lessee's acceptance of the goods*." (emphasis added)).

DLL asserts that Dr. Lakho's staff accepted delivery of the Morpheus8 and that Dr. Lakho "took no steps whatsoever to prevent acceptance." ECF No. 35-1. DLL cites no law supporting its contention that acceptance occurred at the time of delivery. It is undisputed that Dr. Lakho was not present when the device was delivered. Defendants contend they tried to reject the Morpheus8 after its delivery on multiple occasions and that SIIM never used, plugged in, or turned on the

---

at this stage because DLL does not address this argument, nor does it appear to rely on Section 3 to establish acceptance. However, the Court acknowledges that DLL's 30(b)(6) witness testified that DLL anticipated it would seek a signature after the equipment had been received, tested, and accepted by SIIM. ECF No. 41-6 at 16–17.

[3] Although DLL would be entitled to damages for breach due to a wrongful rejection, those damages would be limited to actual damages, not the contract price. *Id.*

device. ECF No. 40 at 51–53. Absent more arguments related to acceptance and rejection, supported by citations to legal authority and the record, the Court cannot determine the Morpheus8 was accepted. Summary judgment is therefore denied on DLL's breach of contract claim against SIIM.[4]

> **V.    Neither DLL Nor Dr. Lakho Are Entitled to Summary Judgment on DLL's Breach of Personal Guaranty Claim against Dr. Lakho.**

As discussed above, the Court cannot conclude the Morpheus8 was accepted, thereby triggering SIIM's unconditional obligations under the Lease. Dr. Lakho cannot be personally bound to guarantee SIIM's obligations if SIIM had no such obligations in the first place. Accordingly, DLL's motion for summary judgment on the breach of guaranty claim must be denied.

Dr. Lakho has also not established he is entitled to judgment as a matter of law on the breach of personal guaranty claim. Dr. Lakho's arguments focus on two primary issues: first, he argues that the personal guaranty clause contained a condition precedent requiring him to personally enter his SSN on the Lease and raises a factual dispute as to whether Ditslear wrote the SSN on the Lease before or after Dr. Lakho signed; second, Dr. Lakho argues there was no express, unambiguous evidence that he intended to bind himself personally.

> **A.    Ditslear Wrote Dr. Lakho's SSN on the Lease Before Signing.**

The Court first resolves Dr. Lakho's attempt to create a factual dispute as to whether Ditslear wrote his SSN on the Lease before or after signing. It is undisputed that Ditslear wrote the SSN, not Dr. Lakho. It is further undisputed that Ditslear did so before presenting the Lease to Dr. Lakho for signing.

---

[4] DLL also argues that Defendants' fraud claims against Invasix fail. The Court need not engage with DLL's arguments relating to fraud because it addresses Defendants' fraud claims against Invasix in connection with Invasix's motion.

Ditslear testified unequivocally that "everything was prepopulated besides [Dr. Lakho's signature and tax ID.]" ECF No. 41-5 at 24. He further confirmed that he handwrote the SSN before he arrived at Dr. Lakho's office. *Id.* Dr. Lakho did not create a genuine dispute in his deposition testimony (or elsewhere). He testified only that he did not recall whether his SSN appeared on the Lease when he signed. ECF No. 41-1 at 28. Dr. Lakho's inability to recall whether his SSN was written on the document before he signed it does not amount to a genuine dispute that it was there. *See Bradshaw v. N.J.*, No. 18-14089, 2026 WL 310110, at *14 (D.N.J. Feb. 5, 2026) (plaintiff's "inability to recall a discussion . . . does not genuinely dispute that such a discussion occurred").[5]

**B.    The Court Cannot Determine as a Matter of Law at this Stage that Dr. Lakho Intended to be Bound by the Personal Guaranty.**

Given there is no dispute of material fact as to whether the SSN appeared on the Lease when Dr. Lakho signed it, the Court must decide whether the Lease required Dr. Lakho to personally enter his SSN to trigger the personal guaranty and if so, whether Dr. Lakho ratified the Lease by signing with his SSN pre-populated. The Court answers the first question affirmatively but finds there is a factual dispute as to Dr. Lakho's ratification.

"[G]uaranty contracts [are] subject to [the] same rules of interpretation as other agreements." *Garden State Tanning, Inc. v. Mitchell Mfg. Group Inc.,* 273 F.3d 332, 335 (3d Cir. 2001) (citing *Mtg. House Lane, Ltd. v. Melso*, 682 A.2d 854, 857 (Pa. Super. Ct. 1993)). "The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the parties." *Binswanger of Pa., Inc. v. TSG Real Estate LLC*, 217 A.3d 256, 262 (Pa.

---

[5] Dr. Lakho points to evidence in the record that Ditslear received Dr. Lakho's email address four days after the Lease was signed and the email address appears on the Lease. *See* ECF No. 41-1 at 28; ECF No. 41-5 at 31. He argues this is evidence that the email address and SSN were added after signing. However, this speculation does not negate that Ditslear testified he had collected the email address four days earlier on all of the documents and that the SSN was pre-populated. ECF No. 41-5 at 24, 31.

2019). It is well settled that the parties' intent must be determined by the writing itself, and when the writing is clear and unambiguous, the court must determine the writing's meaning only by its terms. *Id.* Additionally, the court must "endeavor to find an interpretation which will effectuate the reasonable result intended" before interpreting a provision "in such a way as to lead to an absurdity or make the . . . contract ineffective to accomplish its purpose." *Id.* (citation omitted). However, where the contract is ambiguous, Pennsylvania courts construe the ambiguities against the drafter. *Franklin Interiors v. Wall of Fame Mgmt. Co., Inc.*, 511 A.2d 761, 763 (Pa. 1986). Nonetheless, a signer's "unilateral error" with respect to the contract's interpretation or legal effect does not create an ambiguity, nor does it "afford[] . . . more grounds for relief than does ignorance of the words." *Denlinger, Inc. v. Dendler*, 608 A.2d 1061, 1070 (Pa. Super. Ct. 1992) (quoting *Schoble v. Schoble*, 37 A.2d 604, 605 (Pa. 1944)).

Paragraph 11 of the Lease contains contradictory sentences: "Personal Guaranty: I, the guarantor identified by the Social Security Number above, unconditionally guaranty prompt payment of all the Lessee's obligations. . . . I ACKNOWLEDGE AND AGREE THAT IF I ENTER MY SOCIAL SECURITY NUMBER ABOVE, THEN MY SIGNATURE, . . . SHALL ALSO BIND ME PERSONALLY AS A GUARANTOR . . . ." ECF No. 41-8. The first sentence indicates the SSN is merely an identifier and does not require personal entry onto the form, while the final all-caps sentence appears to require the signer to personally enter the SSN for the personal guaranty to take effect. Each party relies on the portion of the clause that is favorable to it, and neither party attempts to reconcile the two.

Dr. Lakho characterizes the final sentence as containing a condition precedent to the enforceability of the personal guaranty. Pennsylvania law disfavors conditions precedent and will only construe clauses as such where that "clearly appears to have been the parties' intention." *Acme*

*Markets, Inc. v. Fed. Armored Exp., Inc.*, 648 A.2d 1218, 1220 (Pa. Super. Ct. 1994). However, offers must be accepted "in the mode and manner expressly provided by the terms of the offer." *Franklin Interiors*, 511 A.2d at 762. "[T]he offeror is the master of his offer," Restatement (Second) Contracts § 58 cmt. a, and "a written instrument must be strictly construed against its maker." *InfoComp, Inc. v. Electra Prods., Inc.*, 109 F.3d 902, 906 (3d Cir. 1997) (quoting *Cucci v. Rollins Protective Servs. Co.*, 546 A.2d 1131, 1135 (Pa. Super. Ct. 1988)). The drafter's failure to follow its own conditions of acceptance precludes it from relying on the clause for which the conditions were not met. *Id.*

In *Franklin Interiors*, the formation of a valid contract was expressly conditioned upon the written approval by an officer of Franklin Interiors. 511 A.2d at 763. The fact that no officer entered a signature on the document was a facial defect that precluded formation. *Id.* Pennsylvania courts have consistently applied this principle to agreements requiring specific signatures or approval. *See InfoComp, Inc.*, 109 F.3d at 905–06. Although, here there is a question of entry of an SSN and not a signature, the Court finds that the Lease's contradictory, ambiguous clause must be construed against the drafter, DLL. Accordingly, absent ratification, Dr. Lakho cannot be bound by a personal guaranty when DLL failed to follow its own conditions of acceptance.

There is, however, a dispute as to whether Dr. Lakho's signature constituted ratification of the agreement. DLL argues that even if the personal guaranty clause required Dr. Lakho to personally enter his SSN, he ratified it by signing the Lease with the pre-written SSN. Dr. Lakho does not directly respond to this argument, but DLL has not established it is entitled to judgment as a matter of law on this issue. *See* Fed. R. Civ. P. 56(e)(3). "An agreement can be ratified by a party through his actions when he shows an acceptance or adoption of the agreement with an intent to ratify and knowledge of the material consequences." *Bayview Loan Serv., LLC v. Etreih*, No.

14

130801821, 2016 WL 723071, at *3 (Phila. Ct. Com. Pl. Jan. 20, 2016), *aff'd* 2016 WL 6441300 (Pa. Super. Ct. Nov. 1, 2026). The Court agrees with Defendants that Dr. Lakho's signature *could* constitute ratification; however, the argument has not been fully briefed. Summary judgment is, therefore, denied.

**VI.      Dr. Lakho Is Not Entitled to Summary Judgment on DLL's Unjust Enrichment Claim.**

Under Pennsylvania law, a plaintiff raising an unjust enrichment claim must prove: (1) a benefit conferred on defendant by plaintiff; (2) defendant's appreciation of the benefit; and (3) "acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *Schenck v. K.E. David, Ltd.*, 666 A.2d 327, 328 (Pa. Super. Ct. 1995).

**A.      Dr. Lakho May Be Held Personally Liable under the Participation Theory**

Dr. Lakho's argument that he cannot be personally liable for unjust enrichment as a corporate officer fails because he personally participated in the alleged misfeasance. Generally, an officer of a corporation cannot be liable for a tort committed by the corporation unless he personally takes part in the tort. *Wicks v. Milzoco Builders, Inc.*, 470 A.2d 86, 90 (Pa. 1983). This is called "the participation theory." *Id.*; *see also Animalscan, LLC v. Live Oak Veterinary Specialists, LLC*, No. 18-2288, 2019 WL 3801559, at *5 (M.D. Pa. Aug. 13, 2019). "Participation theory, in simple terms, is a theory which imposes personal liability on corporate officers or shareholders where they have personally taken part in the actions of the corporation." *First Realvest, Inc. v. Avery Builders, Inc.*, 600 A.2d 601, 603 (Pa. Super. Ct. 1991) (citing *Wicks*, 570 A.2d at 89–90). The participation theory is only applicable where the claims involve misfeasance by the actor ("the improper performance of an act"); nonfeasance ("the omission of an act which a person ought not to do") is not enough. *Animalscan*, 2019 WL 3801559 at *5 (quoting *Aetna,*

15

*Inc. v. Health Diagnostic Lab'y, Inc.*, No. 15-1868, 2015 WL 9460072, at *9 (E.D. Pa. Dec. 28, 2015).

*Aetna* compared two Pennsylvania cases applying the participation theory. First, *Aetna* explained that a corporate officer who personally supervises the refinancing of a mortgage can be held liable for the mortgagors' loss suffered as a result of the officer's negligence. 2015 WL 9460072 at *9 (discussing *Loeffler v. McShane*, 539 A.2d 876 (Pa. Super. Ct. 1988)). By contrast, a corporate president cannot be held liable for wrongful death as a result of a negligently maintained helicopter where the president did not personally complete the maintenance. *Id.* (discussing *Shay v. Flight C Helicopter Servs.*, 822 A.2d 1 (Pa. Super. Ct. 2003)). The president's nonfeasance—failing to supervise the maintenance—was insufficient to invoke the participation theory. *Id.* Applying these principles at the pleading stage, *Aetna* found that allegations of personally planning, authorizing, and directing a fraud, including submitting bills with false and fraudulent charges and personally profiting from the fraud due to part ownership in the company, were sufficient to invoke the participation theory. *Id.*

Here, it is clear that Dr. Lakho was the only individual involved in entering the transaction between SIIM and DLL. Dr. Lakho is the sole owner of SIIM and was the sole decisionmaker throughout this process. The participation theory would apply, assuming all other elements of the unjust enrichment claim are met. Dr. Lakho is not entitled to summary judgment on those grounds.

**B.      It Is Disputed Whether Defendants Voluntarily Retained the Morpheus8 and Whether Such Retention Is Unjust.**

Dr. Lakho also argues DLL's unjust enrichment claim fails because SIIM and Dr. Lakho never used the Morpheus8 and, therefore, they received no benefit. ECF No. 38-1 at 5. The Court is not convinced that Defendants' decision not to unwrap or use the Morpheus8 means that no

benefit was received. However, the dispute as to the acceptance and rejection of the Morpheus8 bears on DLL's unjust enrichment claim, making summary judgment again inappropriate.

The Restatement (Third) of Restitution and Unjust Enrichment, § 1 cmt. d, explains that the benefit that supports a claim for restitution may take any form: *e.g.*, services, property, saved expenditures. The Restatement further explains that a defendant can be liable in restitution for benefits it attempted to refuse but nonetheless received. *Id.* cmt. e (describing elements of unjust enrichment claims as unhelpful, in particular "the defendant's 'appreciation or knowledge of the benefit,' is both mysterious and potentially mischievous. If the requirement is taken to mean that a defendant cannot be liable in restitution for benefits of which the defendant was unaware—or for benefits that the defendant attempted to refuse—it is plainly incorrect.")). This is consistent with Pennsylvania law, which focuses most significantly on whether the retention of the benefit is unjust and which allows for recovery where the benefit was "either wrongfully secured or passively received." *EBC, Inc. v. Clark Bldg. Sys.*, 618 F.3d 253, 273 (3d Cir. 2010) (cleaned up); *see also Water Polo I, L.P. v. W. Hanover Twp. Sewer Auth.*, 301 A.3d 1009, 1019 (Pa. 2023).

Here, the questions of whether Defendants "wrongfully secured or passively received" the Morpheus8—or whether their efforts at rejection negate that they passively received the device— and whether that is unjust should be decided by a fact finder. Summary judgment is, therefore, denied.

**VII.      Invasix Is Entitled to Summary Judgment.**

Defendants raised three causes of action against Invasix: Violation of the Consumer Fraud Act ("ICFA") (First Count), Fraudulent Inducement (Second Count), and Fraudulent

Misrepresentation (Third Count). ECF No. 13.[6] Invasix moves for summary judgment on all claims. The Court grants Invasix's motion because the misrepresentations and omissions Defendants identify cannot support their fraud claims under Illinois law.

Illinois common law fraud claims require a showing of: "(i) a false representation of material fact, (ii) made with knowledge or belief of that representation's falsity, (iii) made with the purpose of inducing another party to act or to refrain from acting, and (iv) the other party reasonably relies upon the representation to its detriment." *Colagrossi v. Royal Bank of Scotland*, 57 N.E.3d 601, 611 (Ill. App. Ct. 2016) (citation omitted) (fraudulent inducement); *see also Doe v. Dilling*, 888 N.E.2d 24, 35–36 (Ill. 2008) (fraudulent misrepresentation). "Fraud in the inducement exists where the party fully understands what he is signing and is aware of the nature and character of the instrument he has executed, but is deceived by fraudulent representations as to the facts outside the instrument itself." *Colagrossi*, 57 N.E.3d at 611.

To prevail on a consumer fraud claim under the ICFA, a plaintiff must prove: "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in a course of conduct involving trade or commerce, and (4) actual damage to the plaintiff that is (5) a result of the deception." *Ambrosius v. Chicago Athletic Clubs, LLC*, 203 N.E.3d 239, 249 (Ill. App. Ct. 2021) (quoting *De Bouse v. Bayer AG*, 922 N.E.2d 309, 313 (Ill. 2009)). Deceptive acts include "the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce." *Id.* (quoting 815 ILCS 505/2).

---

[6] The parties agree that Illinois law applies to these claims. *See* ECF No. 39-1 at 11–12 (discussing standards under Illinois law); ECF No. 46 at 10 (arguing Illinois law applies and explaining that "[t]his point matters because Illinois law permits fraud-in-the-inducement claims to proceed notwithstanding an integration clause . . . .").

Courts "must consider whether the act was deceptive as reasonably understood in light of *all the information* available to plaintiffs." *Phillips v. DePaul Univ.*, 19 N.E.3d 1019, 1031 (Ill. App. Ct. 2014).

Defendants' fraud theory is based on three purported misrepresentations: (1) Ditslear promised to add a term to the CPA that would allow SIIM to return the Morpheus8 but did not; (2) Ditslear failed to disclose the personal guaranty contained in the Lease; and (3) Dr. Lin, a doctor to whom Invasix directed Dr. Lakho for discussion of the Morpheus8, received a $2,500 commission on the sale. The Court takes each in turn.

### A.   The Promise to Add a Return Clause Cannot Support Defendants' Fraud-Based Claims.

Whether Ditslear falsely represented that he would write in a provision that would allow Defendants to return the Morpheus8 is a disputed fact. It is undisputed that Dr. Lakho asked for such a term to be included. However, Ditslear contends he told Dr. Lakho that could not be accommodated, while Dr. Lakho contends he promised that he would add the term. Ditslear Dep., ECF No. 41-5 at 17; Lakho Dep., ECF No. 41-1 at 25, 40. The Court must construe this factual dispute in the nonmovant's favor and infer that the promise was made and then not fulfilled. The question then becomes whether that fact may be actionable under Illinois law. It is not.

For their common law fraud claims, Defendants cannot rely on Ditslear's misrepresentation that he would add a return clause because a party cannot justifiably rely on an oral promise not contained within a contract that the party had the opportunity to review. "[T]he defense of fraud is, in most situations, unavailable to avoid the effect of the written agreement where the complaining party could have discovered the fraud by reading the instrument, and was in fact afforded a full opportunity to do so." *Colagrossi*, 57 N.E.3d at 611 (quoting *Belleville Nat'l Bank v. Rose*, 456 N.E.2d 281, 284 (Ill. App. Ct. 1983)) (affirming grant of summary judgment where

contract included integration clause and plaintiff "had ample opportunity to consider the terms set forth in the" fully integrated employment agreement). "[A] party may not enter into a transaction with its eyes closed to available information and then charge that it has been deceived by another." *Cozzi Iron & Metal*, 250 F.3d at 574 (cleaned up). In other words,

> One is under a duty to learn, or know, the contents of a written contract before he signs it, and is under a duty to determine the obligations which he undertakes by the execution of a written agreement. . . . And the law is that a party who signs an instrument relying upon representations as to its contents when he has had an opportunity to ascertain the truth by reading the instrument and has not availed himself of the opportunity, cannot be heard to say that he was deceived by misrepresentations.

*Belleville Nat'l Bank*, 456 N.E.2d at 284 (citation omitted).

Dr. Lakho did not read the CPA and instead relied on Ditslear's assurance that "everything was okay," which Dr. Lakho interpreted to mean he had added the return clause. *See* ECF No. 41-1 at 26–27. However, Dr. Lakho was not forced to sign the agreement without reading it, nor did he sign it under any duress. *Id.* at 25–26. He was afforded the opportunity to read the CPA and chose not to. Moreover, the CPA contains an integration clause:

> Customer [SIIM] further acknowledges that this is the complete Agreement between the parties, is subject to the payment terms and conditions contained or referred to herein, and expressly disclaims additional and/or different terms and conditions stated on any purchase orders, sales quotes or other written or oral proposals shared or discussed between the parties.

ECF No. 41-7. The integration and nonreliance clause is determinative. *See Colagrossi*, 57 N.E.3d at 612. Illinois law does not allow Defendants to claim to have been deceived by misrepresentations that could have discovered by reading the CPA. *See id.*

Likewise, Defendants cannot establish they were actually deceived by the purported misrepresentation as required by the ICFA. The ICFA does not require a showing of justifiable reliance; however, it does require proof that Defendants were "actually deceived by the

misrepresentation in order to establish the element of proximate causation." *Avery v. State Farm Mut. Automobile Ins. Co.*, 835 N.E.2d 801, 861 (Ill. 2005) Whether an act was deceptive must be considered "in light of *all the information* available to plaintiffs." *Phillips*, 19 N.E.3d at 1031.

In *Phillips*, the Appellate Court of Illinois affirmed the dismissal of a complaint against a university alleging it had misrepresented employment and salary history of recent law school graduates. *Id.* at 1024. The plaintiffs contended the information was "incomplete, false and materially misleading" because the employment data included jobs that did not require a J.D. and because the salary data was based only on full-time employment. *Id.* at 1024–25. The Court considered all the information available to the plaintiffs, including that the plaintiffs had more information than what the university reported on the website. *Id.* at 1031. For example, the ABA Guides, which the plaintiffs were aware of, provided additional information stating that members of each graduating class obtained "legal, *nonlegal*, and full-and *part-time* jobs," as well as expressly stating that some of the reported jobs did not require legal training. *Id.* Because the plaintiffs had information available to them that would have negated any misrepresentation, the court concluded the plaintiffs failed to adequately plead the university committed a deceptive act or practice by misrepresenting the employment information. *Id.*

Similarly here, when examining all the information available to Defendants, they have not shown that Invasix or Ditslear committed a deceptive act by misrepresenting a return clause would be included. It clearly was not. The CPA, a one-page document containing an integration clause and no return clause, had no provision allowing for return of the device. Dr. Lakho could have read the CPA before signing but did not. Although Defendants need not prove justifiable reliance for an ICFA claim, they cannot assert a deceptive act occurred when Dr. Lakho had the information at his fingertips to ascertain the truth.

**B.      The Failure to Disclose the Guaranty Clause Cannot Support Defendants'
        Fraud-Based Claims.**

For the same reasons, Defendants cannot maintain common law or statutory fraud-based claims based on Ditslear's failure to tell Dr. Lakho that signing the Lease with his SSN on it would bind him personally for the full amount of the obligation. Again, this language appeared on the Lease, which Dr. Lakho claimed he did not read. ECF No. 41-1 at 30. That Dr. Lakho neglected to read the Lease does not mean Ditslear concealed any material facts. In fact, nothing was concealed because the clause was presented to Dr. Lakho in black and white. Defendants cannot assert they were deceived when the clause was written into the agreement Dr. Lakho signed.

**C.      The Failure to Disclose the Referral Fee Cannot Support Defendants'
        Fraud-Based Claims.**

Defendants present a third alleged misrepresentation in their opposition to Invasix's motion: Invasix failed to disclose a commission paid to Dr. Lin, a doctor with whom Dr. Lakho spoke about the benefits of the Morpheus8. Before signing the CPA, Dr. Lakho had wanted to speak with a doctor who used the Morpheus8. ECF No. 41-1 at 23–24. Ditslear connected Dr. Lakho with Dr. Lin, a Pennsylvania physician whom Invasix uses as a "key opinion leader." Ditslear Dep., ECF No. 41-5 at 19. Dr. Lin "spoke highly about the machine" and the revenue it generated. Lakho Dep., ECF No. 41-1 at 23–24; ECF No. 41-5 at 19. Dr. Lakho asked Ditslear for additional doctors who used the machine, and Ditslear provided a link to a website with a list of doctors, which Dr. Lakho did not visit. ECF No. 41-1 at 24. Ditslear testified that Dr. Lin received a $2,500 commission from Invasix that was contingent on the sale closing, but he did not know whether Dr. Lin disclosed this financial interest to Dr. Lakho. ECF No. 41-5 at 19. Dr. Lakho was not asked about the referral fee or commission at his deposition. The referral fee could not have been discovered by reading the CPA.

22

Nonetheless, Defendants cannot rest on this misrepresentation because they have not established it was material or that it caused them harm. Defendants do not contend that Dr. Lin misrepresented anything about the Morpheus8 because he would benefit from the sale. Absent some misrepresentation by Dr. Lin due to his potential bias, there can be no harm resulting from Dr. Lakho's belief that Dr. Lin was impartial. *See Ambrosius*, 203 N.E.3d at 249 (actual damage must result from material misrepresentation or omission for ICFA claim); *Colagrossi*, 57 N.E.3d at 611 (reasonable reliance must be to party's detriment for common law fraud claim). Additionally, the harm Defendants raise relates to the contract itself, not how the machine functioned or the amount of revenue they earned from its use—the topics about which Dr. Lin spoke. Defendants have, therefore, not put forth sufficient evidence in support of their fraud claims against Invasix, and Invasix's motion for summary judgment is granted.

## VIII.    Conclusion

For the foregoing reasons, the Court grants Invasix's motion for summary judgment and denies DLL's and Dr. Lakho's motions for summary judgment.

23